## NOTICE:   SLIP OPINION
### (not the court's final written decision)

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
JUNE 2, 2022

*González, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JUNE 2, 2022

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| MARI YVONNE DAVIES, | NO. 100079-1 |
| Respondent, | |
| v. | EN BANC |
| MULTICARE HEALTH SYSTEM, a Washington corporation d/b/a GOOD SAMARITAN HOSPITAL, and MT. RAINIER EMERGENCY PHYSICIANS, PLLC; MICHAEL HIRSIG, M.D., | Filed: June 2, 2022 |
| Petitioners. | |

GORDON McCLOUD, J.—This case addresses the difference between two claims that arose from the same accident and that were based on the same medical care: a medical malpractice claim and a failure to secure informed consent claim. We adhere to our prior decisions holding that these are two separate claims and that in general, a patient cannot bring an informed consent claim where, as here, the physician ruled out the undiagnosed condition entirely.

## FACTUAL BACKGROUND

On August 23, 2017, Mari Davies was in a single-car rollover accident. Clerk's Papers (CP) at 52. Emergency responders transported her to the emergency

No. 100079-1

room (E.R.) at Good Samaritan Hospital in Puyallup. *Id.* at 53. When Davies arrived at the E.R. she had hypertension, high blood pressure, left shoulder pain, neck pain, chest pain, abdominal pain, a headache, and some tingling in her left arm. *Id.* at 53-54. She also had preexisting kidney stones, diverticulosis, pneumonia, and diabetes. *Id.* at 54-55.

Dr. Michael Hirsig evaluated her as soon as she arrived in the E.R. *Id.* at 55. Dr. Hirsig ordered computerized tomography (CT) scans of her head, cervical spine, abdomen, chest, and pelvis. *Id*. He also ordered an electrocardiogram and X-rays, among other laboratory tests and blood work. *Id.* at 55, 73.

Davies' CT scan showed a cervical spine fracture at the C3 level. *Id.* at 55-56. Dr. Hirsig therefore consulted by phone with Dr. William Morris, the on-call neurosurgeon for Good Samaritan Hospital. *Id.* at 55. Dr. Morris reviewed the images and noted Davies' C3 fracture; he determined that it did not require surgery. *Id.* at 55, 59. Dr. Morris recommended a cervical collar for eight weeks with a follow-up CT scan to check for healing and alignment. *Id.* at 59.[1]

Dr. Hirsig diagnosed Davies with a stable cervical spine fracture. *Id.* at 56, 72. He then placed Davies in an Aspen collar and had her "ambulate" around the

---

[1] Dr. Morris' notes also reflect his assumption that Davies would be transferred to Tacoma General Hospital for observation. CP at 59. But after hearing that Davies' fracture did not require surgery, Dr. Hirsig determined that transfer to Tacoma General was not necessary and that discharge was more appropriate. *Id*. at 176-78.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

room to make sure she could be discharged. *Id.* at 55, 177. He determined that she had no "neurological symptoms." *Id.* at 177. He gave her Percocet (for pain), Zofran (for nausea), and Flexeril (a muscle relaxant) and told her to schedule a follow-up with Dr. Morris and her primary care provider, Dr. Andrew Larsen. *Id.* at 55, 72, 178. He then discharged her to the care of her family. *Id.* at 55, 178.

Davies visited her primary care provider, Dr. Larsen, the next day. *Id.* at 84. While in his office, Davies exhibited stroke symptoms. She was immediately transported to the E.R. at Providence St. Peter Hospital. She had, indeed, suffered a stroke. *Id.* at 89. Davies now has brain damage and lives in an assisted living facility. *Id.* at 63, 67-68.

Davies' stroke was caused by a vertebral artery dissection (VAD) that occurred at the time of the accident.[2] *Id.* at 89-90. A VAD is typically detected by a computed tomography angiography (CTA) scan. *Id.* at 129. A CTA scan involves injecting the patient with a contrast dye that lights up in a CT scanner to detect any artery dissections. 5 Verbatim Tr. of Proceedings (VTP) (Oct. 3, 2019) at 762-63. It is undisputed that Dr. Hirsig did not order a CTA scan for Davies while she was in the E.R. CP at 551.

---

[2] There are two vertebral arteries that run along the side of the neck. 4 Verbatim Tr. of Proceedings (VTP) (Oct. 2, 2019) at 504; 6 VTP (Oct. 7, 2019) 940. If one of those arteries experiences a tear (dissection), then blood will start to clot to heal the tear; but those clots can quickly travel to the brain and cause a stroke. 4 VTP (Oct. 2, 2019) at 504.

No. 100079-1

PROCEDURAL HISTORY

    I.       The trial court dismissed the informed consent claim on summary judgment; the jury found for the health care provider defendants on Davies' negligence claim at trial

On May 31, 2018, Davies filed suit against MultiCare Health System, the parent corporation of Good Samaritan Hospital, alleging (1) medical negligence, (2) failure to obtain informed consent, and (3) corporate negligence. *Id.* at 1-4. Davies later amended her complaint to add defendant Mt. Rainier Emergency Physicians, the employer that procures Dr. Hirsig's independent contractor services. *Id.* at 18, 61. Dr. Hirsig also intervened as a defendant. *Id.* at 799.

On cross motions for partial summary judgment, the trial court dismissed Davies' informed consent claim.[3] *Id.* at 22-32, 33-44, 110-23, 590-92.

The trial court based its decision on the following undisputed evidence. Davies' experts testified (at deposition) that because Davies was in a rollover collision and had fractures at the C3 level of her neck, she was at risk of a VAD.

---

[3] Mt. Rainier Emergency Physicians and Dr. Hirsig moved for summary judgment dismissal of Davies' corporate negligence and informed consent claims. CP at 22. MultiCare moved for summary judgment to dismiss all claims against MultiCare employees/agents, besides the claims regarding Dr. Morris and Dr. Hirsig, and it moved to dismiss Davies' claim of corporate negligence against MultiCare. *Id.* at 110. Davies moved for partial summary judgment as to the defendant's affirmative defenses of comparative fault and third party fault—the motion regarding third party fault was unopposed and was granted. *Id.* at 34, 818. The trial court granted the motion to dismiss the informed consent claim. *Id.* at 590-92. The court also granted an agreed motion for summary judgment dismissal of claims against MultiCare employees and agents other than Dr. Morris and Dr. Hirsig. *Id.* at 821. The trial court denied the rest of the motions. *Id.*

4

*Id.* at 142, 145. Davies' experts also testified that if Davies had undergone a CTA, it would have revealed her VAD and she would have received treatment that likely would have prevented the stroke. *Id.* at 145, 147-48, 198. Additionally, Davies' experts testified that a VAD is "commonly found" when there is a cervical spine fracture, so it is standard to perform a CTA scan if there is a C3 fracture. *Id.* at 143, 145. Once a VAD is detected, a medication regimen of Plavix, heparin, or aspirin should have been started to prevent a subsequent stroke. *Id.* at 145.

Dr. Hirsig testified (via deposition) that he considered the possibility of a VAD but that Davies' symptoms and presentation led him to rule it out:

> Q      What would be the signs or symptoms that would cause you to order a CTA?
>
> A      Well, I mean, in this—in Ms. Davies' case, she had—she would have had signs and symptoms consistent with, you know, vertebral artery dissection. Or if I was concerned about that on my clinical evaluation, then I would have ordered it. She had nothing that led me to believe or suspect that she had a dissection.
>
> Q      Did you consider a vertebral artery injury in your differential diagnosis for this—
>
> A      Yeah.
>
> Q      For Ms. Davies? You did?
>
> A      Yeah. Absolutely. I mean, I considered all types of injuries. I mean, she could have had a vertebral artery dissection. She could have had a head bleed. She could have had a pneumothorax, rib fractures, hip fractures. So, yeah, I had to consider all of that.
>
> Q      Did you ultimately exclude vertebral artery injury?

A      You know, in my judgment, I mean, my—in my judgment, at that time, her clinical picture did not lead me to suspect that she had a dissection. She had no signs or symptoms of it.

Q      What would you be looking for? What would be the signs and symptoms you would be looking for of a vertebral artery injury?

A      Like we talked about, usually you will see a little bit of vertigo. They will have maybe some nystagmus. They'll have a Horner's syndrome. They will have inability to stand, loss of balance. They can have blurred vision, facial pain, ear pain. They can have swelling in the throat or in the neck.

Q      Okay. And if you had suspected vertebral artery dissection, or vertebral artery injury, is there—would you have ordered a CTA or an MRI, or what would you have done?

A      It all depends. In Mrs. Davies' case, I didn't suspect that she had a dissection, so I didn't order anything else.

*Id.* at 512. The trial court apparently found no material factual dispute related to the informed consent claim and dismissed it as unsupported by the law. *Id.* at 590-91.

Davies' medical negligence claims proceeded to trial. The jury found that none of the health care provider defendants were negligent. 15 VTP (Oct. 23, 2019) at 3074; CP at 823. The trial court entered judgment against Davies. CP at 826-32.

No. 100079-1

II.    The Court of Appeals reversed the trial court's summary judgment dismissal of the informed consent claim

Davies appealed the trial court's order dismissing her informed consent claim.[4] The Court of Appeals reversed the dismissal of that claim and remanded. *Davies v. MultiCare Health Sys.*, 18 Wn. App. 2d 377, 381, 491 P.3d 207 (2021).

The Court of Appeals opined that Davies had presented evidence at summary judgment showing that "had she undergone a CTA, her vertebral artery dissection would have been diagnosed and a different treatment regimen other than sending her home in a neck brace would have been initiated, preventing her subsequent stroke." *Id.* at 390. The court explained that "Davies was never advised of the risk of a vertebral artery dissection or the availability of a CTA scan to look for the injury which would have led to a different treatment." *Id.* at 391. It also explained that the doctors had diagnostic procedures available to test Davies for a vertebral artery dissection. *Id.* at 392. It then concluded that these facts were sufficient to support an informed consent claim. *Id.* at 391-92. It therefore reversed the trial court's dismissal of that claim. *Id.* at 392.

---

[4] Davies also appealed the trial court's decisions to give an exercise of judgment jury instruction and to prevent her expert neurosurgeon from testifying at trial regarding the standard of care for an emergency room physician. *Davies v. MultiCare Health Sys.*, 18 Wn. App. 2d 377, 381, 491 P.3d 207 (2021). She did not petition for review of these issues in this court. Answer to Pet. for Review at 1-2.

7

No. 100079-1

We accepted review of whether the informed consent claim was properly dismissed at summary judgment. *Davies v. MultiCare Health Sys.*, 198 Wn.2d 1026 (2021).

### ANALYSIS

Motions for summary judgment are reviewed de novo, and this court engages in the same inquiry as the trial court. *DeWater v. State*, 130 Wn.2d 128, 133, 921 P.2d 1059 (1996). We will "consider only evidence and issues called to the attention of the trial court." RAP 9.12. Summary judgment is proper if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Gunnier v. Yakima Heart Ctr., Inc.*, 134 Wn.2d 854, 858, 953 P.2d 1162 (1998); CR 56(c). We review all evidence in the light most favorable to the nonmoving party. *Keck v. Collins*, 184 Wn.2d 358, 368, 357 P.3d 1080 (2015).

I.     Background about informed consent claims and medical malpractice claims

Under the common law doctrine of informed consent, "a health care provider has a fiduciary duty to disclose relevant facts about the patient's condition and the proposed course of treatment so that the patient may exercise the right to make an informed health care decision." *Stewart-Graves v. Vaughn*, 162 Wn.2d 115, 122, 170 P.3d 1151 (2007) (citing *Miller v. Kennedy*, 11 Wn. App. 272, 282, 522 P.2d 854 (1974), *aff'd*, 85 Wn.2d 151, 530 P.2d 334 (1975)). This doctrine is based on "the individual's right to ultimately control what happens to his body."

8

No. 100079-1

*Keogan v. Holy Family Hosp.*, 95 Wn.2d 306, 313-14, 622 P.2d 1246 (1980). We first recognized this right in *ZeBarth v. Swedish Hospital Medical Center*, 81 Wn.2d 12, 499 P.2d 1 (1972), and it was later codified in RCW 7.70.050 and RCW 7.70.030. *Stewart-Graves*, 162 Wn.2d at 123.

RCW 7.70.030(3) codified that common law informed consent claim by stating that a patient can assert a claim when an "injury resulted from health care to which the patient or his or her representative did not consent." RCW 7.70.050(1) then codified the elements required to prove such a claim:

> (a) That the health care provider failed to inform the patient of a material fact or facts relating to the treatment;
> (b) That the patient consented to the treatment without being aware of or fully informed of such material fact or facts;
> (c) That a reasonably prudent patient under similar circumstances would not have consented to the treatment if informed of such material fact or facts;
> (d) That the treatment in question proximately caused injury to the patient.

A typical informed consent case arises when a physician diagnoses a patient's condition and recommends a course of treatment. *Backlund v. Univ. of Wash.*, 137 Wn.2d 651, 661 n.2, 975 P.2d 950 (1999). The physician must disclose the risks attendant to such treatment and allow the patient to make an informed decision about accepting those risks. Otherwise, the physician faces liability under RCW 7.70.050. *Id.* "Similarly, the physician is liable if the physician fails to

9

No. 100079-1

disclose other courses of treatment, including no treatment at all, as options upon

which the patient makes the ultimate choice." *Id.*

A medical malpractice claim based on an alleged misdiagnosis is different.

To bring a negligence claim for failure to follow the standard of care, a plaintiff

must show that

> (a) The health care provider failed to exercise that degree of
> care, skill, and learning expected of a reasonably prudent health care
> provider at that time in the profession or class to which he or she
> belongs, in the state of Washington, acting in the same or similar
> circumstances;
>
> (b) Such failure was a proximate cause of the injury complained
> of.

RCW 7.70.040(1).

> II.   Misdiagnosis claims and informed consent claims are distinct, and "a
>       health care provider who believes the patient does not have a
>       particular disease cannot be expected to inform the patient about the
>       unknown disease or possible treatments for it"

Misdiagnosis claims and informed consent claims are different. Our two

most recent decisions analyzing the difference between the two claims were both

decided after the legislature codified the informed consent claim. Both decisions

clearly held that under RCW 7.70.050(1), the physician has a duty to inform the

patient about "treatment" options; the physician does not have a duty to inform the

patient about possible diagnoses. While treatment and diagnosis can at times

overlap, a physician cannot be held liable for failure to secure informed consent if

10

No. 100079-1

the physician misdiagnoses the patient and therefore remains unaware of treatment options for the undiagnosed condition.

In the first case, *Backlund*, this court held that informed consent claims and negligence claims are distinct causes of action that generally cannot be based on the same underlying facts. In that case, the Backlunds' newborn daughter, Ashley, suffered from jaundice and Dr. Jackson treated her with phototherapy. 137 Wn.2d at 654-55. The type of jaundice Ashley experienced was generally treated with phototherapy, but more serious cases were treated with a transfusion of all the blood in the infant's body. *Id* at 655. Transfusion poses significantly greater health risks. *Id*. Dr. Jackson never discussed the option of a transfusion with the Backlunds because he determined that the risk of brain damage from jaundice was less likely than the risk of death or serious bodily harm from a total blood transfusion. *Id* at 656.

But the phototherapy failed, and Ashley suffered brain damage. *Id.* at 655. A jury found in favor of Dr. Jackson on the Backlunds' subsequent negligence claim "because Dr. Jackson did not breach the standard of care in deciding to treat Ashley with phototherapy rather than a complete transfusion of her blood." *Id.* The parties then tried the informed consent claim to the bench. *Id.* The court ruled that the informed consent claim was proper in this context because Ashley was correctly diagnosed with jaundice, so the Backlunds should have been informed

11

No. 100079-1

that transfusion was a "recognized possible alternative form of treatment." *Id.* at 655-57 (internal quotation marks omitted). The trial court nevertheless rejected the claim for a different reason—failure to prove causation. *Id.* at 658. The Court of Appeals affirmed, and this court accepted review.

We affirmed and agreed with the trial court's reasoning. We began by emphasizing that "[n]egligence and informed consent are alternative methods of imposing liability on a health care practitioner" and a plaintiff can prevail on a failure to secure informed consent claim even if that patient loses on the negligence claim. *Id.* at 659. We continued that these two claims cannot be "'predicated on the same facts.'" *Id.* at 661 (quoting *Bays v. St. Luke's Hosp.*, 63 Wn. App. 876, 883, 825 P.2d 319 (1992)). We concluded, "A physician who misdiagnoses the patient's condition, and is therefore unaware of an appropriate category of treatments or treatment alternatives, may properly be subject to a negligence action where such misdiagnosis breaches the standard of care, but may not be subject to an action based on failure to secure informed consent." *Id.*

We therefore agreed with the trial court that Dr. Jackson properly diagnosed Ashley with jaundice, so he should have informed the Backlunds that transfusion was an alternative treatment option. *Id.* at 662. But we also upheld the trial court's decision to reject the claim due to failure to prove causation. *Id.* at 668-70.

12

No. 100079-1

In that case, Dr. Jackson properly diagnosed Ashley's medical problem (jaundice); Dr. Jackson was therefore required to provide the Backlunds with sufficient information to ensure that they provided informed consent to her treatment. In this case, however, Dr. Hirsig affirmatively ruled out Davies' medical problem (VAD). For that reason, Dr. Hirsig remained unaware of the "appropriate category of . . . treatment alternatives" that were available. *Id.* at 661. Following *Backlund*, a patient cannot bring an informed consent claim based solely on the physician's misdiagnosis.

Our second case interpreting RCW 7.70.050(1), *Anaya Gomez v. Sauerwein*, 180 Wn.2d 610, 331 P.3d 19 (2014), also held that a claim of failure to procure informed consent generally cannot rest on the fact that the physician ruled out the correct diagnosis. In that case, Christina Anaya suffered from uncontrolled diabetes, causing her to be immunocompromised and susceptible to serious infections. *Id.* at 613. In 2006, she went to the hospital complaining of urinary tract infection symptoms. *Id*. The hospital took urine and blood samples, and several days later her blood culture results came back positive for yeast. *Id.* at 613-14. Dr. Sauerwein, her treating physician, was concerned about the test result but determined that it was more likely that it was a false positive, a common occurrence in microbiology labs. *Id*. at 614. Dr. Sauerwein had a nurse call Anaya, who said she was feeling better. The doctor moved Anaya's appointment up, but

13

No. 100079-1

he did not tell her about the positive test result. *Id*. Several days later, Anaya's

condition worsened.  She went to the hospital and was diagnosed with glabrata, a

serious yeast infection of the blood. *Id.* at 615. The treatment for this infection

came too late to stop the glabrata from spreading to her internal organs; she died

from this disease at age 32. *Id*. Anaya's estate brought suit against Dr. Sauerwein

and the clinic. *Id.* The trial judge granted the defense motion to dismiss the

informed consent claim. *Id*. A jury found in favor of Dr. Sauerwein on the

negligence claim. *Id.* at 616. The Court of Appeals affirmed. *Id.*; *Anaya Gomez v.*

*Sauerwein*, 172 Wn. App. 370, 385, 289 P.3d 755 (2012).

On review in this court, we held that providers do not have a duty to inform

patients of all positive test results because "[a] lab test is one tool among many that

a health care provider uses to form a diagnosis" and "[o]nly after the provider has

used these tools to make a diagnosis can he or she inform the patient about possible

treatments and the risks associated with each." *Anaya Gomez*, 180 Wn.2d at 620.

We explained,

> [A] health care provider who believes the patient does not have a
> particular disease cannot be expected to inform the patient about the
> unknown disease or possible treatments for it. In such situations, a
> negligence claim for medical malpractice will provide the patient
> compensation if the provider failed to adhere to the standard of care in
> misdiagnosing or failing to diagnose the patient's condition.

*Id.* at 618. We further explained,

14

No. 100079-1

> [W]hen a health care provider rules out a particular diagnosis based on the patient's clinical condition—including test results, medical history, presentation upon physical examination, and any other circumstances surrounding the patient's condition that are available to the provider—the provider may not be liable for informed consent claims arising from the ruled out diagnosis under RCW 7.70.050.

*Id.* at 613. This court therefore concluded, "informed consent [claims are] available only when there is something to inform the patient about." *Id.* at 626-27.

The language of RCW 7.70.050 and our decisions in *Backlund* and *Anaya Gomez* make clear that a physician has a duty to provide a patient with information about relevant treatment options. But those decisions also make clear that if a physician rules out a diagnosis based on a patient's total clinical picture, then that physician has no duty to inform the patient about a condition of which the physician is unaware.

Here, Dr. Hirsig ruled out a VAD based on Davies' total clinical picture. He did not provide her with treatment options for a VAD because he did not know she had it. This set of undisputed facts is sufficient to support a medical malpractice claim. It is not sufficient to support an informed consent claim.

No. 100079-1

III.     The *Gates*[5] exception for a known "abnormal [body] condition" does not apply to these facts, which support a claim of medical malpractice but not of failure to procure informed consent

Acknowledging the distinction between misdiagnosis and informed consent claims, Davies argues that Dr. Hirsig correctly diagnosed Davies' condition as multiple neck fractures but failed to inform her (1) that VAD was essentially a risk of the neck fracture diagnosis and (2) that other treatment options were available to deal with this risk. Resp't's Suppl. Br. at 1. Davies argues that the "material risk[]" of a cervical neck fracture is a VAD and the "treatment options" are a CTA scan and medication to prevent strokes. *Id.* at 1, 14.

Davies points to our decision in *Gates* to support this assertion. Resp't's Suppl. Br. at 9, 13, 15. The *Gates* case arose before the informed consent claim was codified. In May 1972, Elisabeth Gates consulted her ophthalmologist, Dr. Hargiss, about difficulty in focusing, blurring, and gaps in her vision. *Gates,* 92 Wn.2d at 247. Gates was 54 years old at the time and had severe myopia, which doubled her risk of glaucoma. *Id.* Dr. Hargiss found high pressure in both eyes that put her in a borderline area for glaucoma. *Id*. But Dr. Hargiss then examined Gates' optic nerves (without benefit of dilation) and found no abnormality. As a result, he did not perform any other tests for glaucoma. *Id*. In response to Gates' inquiry about the eye pressure test, he said that he had "checked for glaucoma but

---

[5] *Gates v. Jensen,* 92 Wn.2d 246, 251, 595 P.2d 919 (1979).

No. 100079-1

found everything all right" and diagnosed her with difficulties with her contact lenses. *Id.* at 247-48.

By the time Gates' glaucoma was discovered, about two years later, her vision had deteriorated drastically to the point of being functionally blind. *Id.* at 248-49. Gates brought a malpractice claim. *Id.* at 247. At the end of trial, Gates requested an instruction on the doctrine of informed consent; the trial court denied her request. *Id.* at 249. The jury ruled for the health care providers, and the Court of Appeals affirmed. *Id.*; *Gates v. Jensen*, 20 Wn. App. 81, 579 P.2d 374 (1978). This court reversed the trial court's refusal to give the informed consent instruction. *Gates*, 92 Wn.2d at 249. We held that a physician's duty to obtain informed consent can extend beyond the treatment of a medical condition to the diagnostic phase of care. *Id.* at 250. Specifically, this court held that a patient has a right to know of "[t]he existence of an abnormal condition in one's body, the presence of a high risk of disease, and the existence of alternative diagnostic procedures to conclusively determine the presence or absence of that disease." *Id.* at 251. This court determined that "[t]he physician's duty of disclosure arises, therefore, whenever the doctor becomes aware of an abnormality which may indicate risk or danger." *Id.* (citing *Betesh v. United States*, 400 F. Supp. 238 (D.D.C. 1974)).

But Dr. Hirsig never identified an "abnormality" in Davies, other than the neck fractures that he explicitly diagnosed. Dr. Hirsig ruled out a VAD and determined that Davies exhibited "no . . . neurological symptoms." CP at 177. Rather, he diagnosed Davies with an entirely different condition—a stable cervical spine fracture. CP at 56, 72. Therefore, Dr. Hirsig did not have a duty to inform Davies under *Gates*.

Additionally, *Gates* was decided before the legislature enacted RCW 7.70.050. While *Gates* has not been overruled, it has been significantly narrowed. *Anaya Gomez*, 180 Wn.2d at 623, 626 ("*Gates* is the exception and not the rule with regard to the overlap between medical negligence and informed consent.") It is possible that treatment and diagnosis can overlap in some circumstances. Davies' case, however, does not present such a circumstance.

Instead, Davies' claim falls into the medical negligence category. Dr. Hirsig misdiagnosed Davies and ruled out a VAD as a possible diagnosis. A VAD is a condition that must be diagnosed, and a CTA scan is the tool used to diagnose a VAD. In his deposition testimony that was provided at summary judgment, Dr. Hirsig said that he had considered VAD as a "diagnosis," but he ruled it out as an option because "[s]he had no signs or symptoms of it." CP at 512. Dr. Hirsig's testimony that he determined that Davies did not have a VAD was uncontradicted.

18

No. 100079-1

In fact, Davies herself consistently refers to a VAD as a condition that a physician must "diagnose" (rather than a treatment that a physician might offer) and refers to a CTA scan as the "diagnostic test" used to identify a VAD (rather than a treatment used to mitigate or cure it). *See, e.g.*, Resp't's Suppl. Br. at 21 ("Davies had numerous diagnostic and treatment options including a CTA scan and medication like Plavix and aspirin."); CP at 33 ("In fact, Ms. Davies had a vertebral artery dissection that was left undiagnosed."), 37 ("That injury could have been diagnosed and treated *if* Defendants had performed a CTA scan prior to discharge . . . ."), 129 ("Had Ms. Davies undergone a CTA, her vertebral artery dissection would have been diagnosed and treatment would have been initiated . . . ."), 3 (in her complaint Davies frames her informed consent cause of action as Dr. Hirsig's failure to explain "the alternative diagnostic tests and treatments available."), 142 (in deposition Davies expert was asked, "Was Ms. Davies ever diagnosed with a vertebral artery dissection?" to which the expert responded, "It was diagnosed—it was found on the CT angiogram.").

The Court of Appeals similarly referred to a VAD as a diagnosis and a CTA scan as the diagnostic tool. *Davies*, 18 Wn. App. 2d at 391 ("had she undergone a CTA, she would have been diagnosed with a vertebral artery dissection, which then would have been treated").

19

No. 100079-1

Dr. Hirsig failed to diagnose Davies with a VAD—a failure that can be, and was, properly brought as a negligence action. Like the physician in *Anaya Gomez*, Dr. Hirsig examined the entirety of his patient's current medical conditions, medical history, and presentation of symptoms and determined that she did not have a VAD and that a CTA scan to detect a VAD was therefore unnecessary. CP at 512. Unlike the physician in *Backlund*, Dr. Hirsig did not properly diagnose Davies with a VAD—Dr. Hirsig was therefore unaware of her condition and the potential treatment options for that condition. *Backlund*, 137 Wn.2d at 662. Additionally, Dr. Hirsig would have to diagnose a VAD for him to be aware of the possibility of a stroke and the necessity for medication to prevent a stroke. A "provider may not be liable for informed consent claims arising from [a] ruled out diagnosis under RCW 7.70.050." *Anaya Gomez,* 180 Wn.2d at 613. Dr. Hirsig cannot be expected to have informed his patient about a condition of which he was not aware. *Id*. at 618; *Backlund*, 137 Wn.2d at 661.

RCW 7.70.050(1) limits informed consent claims to "treatment," and here, Dr. Hirsig did not inform Davies of other possible diagnoses or of other diagnostic tests available. Davies' allegations and evidence therefore supported a misdiagnosis negligence claim. They did not support an informed consent claim.

20

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 100079-1

CONCLUSION

Dr. Hirsig failed to properly diagnose Davies with a VAD. Davies can and did bring a negligence action based on that misdiagnosis. But she cannot bring an informed consent claim where, as here, the physician ruled out the undiagnosed condition entirely. The physician is not required to obtain informed consent about taking further action to detect or mitigate a condition that the physician has ruled out.

We reverse the Court of Appeals and reinstate the trial court's order dismissing Davies' informed consent claim.

_____
Gordon McCloud, J.

WE CONCUR:

_____
González, C.J.

_____
Stephens, J.

_____
Johnson, J.

_____
Yu, J.

_____
Madsen, J.

_____
Whitener, J.

_____
Owens, J.

_____
Schindler, J.P.T

21