# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| KATHRYN LEE KIM, Guardian for H.K., a minor; and MARK KIM and KATHRYN LEE KIM, individually as the parents of H.K., | DIVISION ONE |
| | No. 85181-1-I |
| Appellants, | UNPUBLISHED OPINION |
| v. | |
| SEATTLE CHILDREN'S HOSPITAL, a non-profit Washington Corporation; JOHN R. WILLIAMS, MD; JASON S. HAUPTMAN, MD, and the State of Washington, | |
| Respondents, | |
| JUSTIN L. WILLIS, MD; RYAN D. KEARNEY, MD; DANIEL TA YO YU, MD, | |
| Defendants. | |

DWYER, J. — Kathryn (Kate) and Mark Kim appeal from the judgment entered on a jury's verdict finding in the Kims' favor with regard to their premises liability claim against Seattle Children's Hospital and finding in favor of the University of Washington with regard to the Kims' medical negligence claim against the University.[1] On appeal, the Kims assert that the trial court erred by granting Seattle Children's Hospital's motion for partial summary judgment on the

---

[1] This opinion uses the adult appellants' first names as used by them in their opening brief and uses H.K. to refer to the child in this matter. We also refer to defendant State of Washington herein as the University of Washington. The University is the employer of the physicians named on appeal.

Kims' Consumer Protection Act[2] (CPA) claim and by granting the hospital's motion for judgment as a matter of law on the Kims' statutory informed consent claims. The Kims also assert that the trial court abused its discretion by ruling that it would provide the jury with three supplemental standard of care instructions and one supplemental causation instruction. This was error, the Kims aver, because, although these instructions were each individually appropriate, when provided in combination with one another, the instructions overemphasized the University's theory of the case. Finding no error, we affirm.

I

In April 2019, H.K., a two-year-old boy, was chasing his sister around a room in his family's home when he collided with a wall, hitting the right side of his head. He began crying immediately thereafter. He did not lose consciousness. Both of H.K.'s parents, Mark and Kate, were also in the room at the time but neither directly witnessed the incident. They were able to console H.K. and later put him to bed without apparent incident.

Around 4:00 a.m. the following morning, H.K. awoke crying inconsolably, complaining of head pain, and vomiting repeatedly. Kate contacted one of H.K.'s pediatrician's nurses who instructed Kate to bring H.K. to the pediatric clinic in Bellevue. After arriving at the clinic later that morning, H.K.'s pediatrician observed that H.K. was more lethargic and quieter than usual. The pediatrician recommended that the Kims immediately take H.K. to Seattle Children's Hospital

---

[2] Ch. 19.86 RCW.

2

for further evaluation. The Kims promptly drove H.K. to Seattle Children's Hospital. He was admitted to the hospital's emergency department.

Later that morning, an emergency room physician examined H.K. The doctor observed that H.K. appeared fatigued and had "[m]ild subcutaneous swelling present on the right parietal region" of his head but appeared otherwise neurologically normal. The physician ordered a CT-scan without contrast of H.K's head. The radiologist's impression from the resulting imaging study was a left-sided "predominantly subarachnoid hemorrhage" that extended to a "masslike density" in H.K.'s brain.[3] The radiologist's report stated that the

> [f]indings may be consistent with contrecoup injury, given the history of right parietal region trauma, with mixed density blood product distending the left superior temporal sulcus, however an underlying soft tissue mass or vascular abnormality is difficult to exclude. If the mechanism of injury is not concordant with the amount of blood product present, [magnetic resonance imaging (MRI)] could provide further characterization.

The emergency physicians then consulted with John Williams, M.D., a fourth-year neurosurgery resident. That day, Dr. Williams was under the supervision of the attending physician of the hospital's neurosurgery floor, Jason S. Hauptman, M.D., PhD., a board-certified pediatric neurosurgeon and University of Washington faculty member. Dr. Williams reviewed H.K.'s medical records and the results of his CT scan, obtained H.K.'s history from the emergency department staff, his nurse practitioner, and H.K.'s mother, and conducted a medical examination of H.K. Dr. Williams determined that H.K.'s

---

[3] A subarachnoid hemorrhage occurs when there is bleeding in the subarachnoid space—the space between the brain and the surrounding membrane. A subarachnoid hemorrhage is also known as intracranial bleeding.

symptoms of headache, vomiting, and fussiness were consistent with a concussion, and, on examination, observed that H.K. responded appropriately, had an appetite, and otherwise appeared neurologically normal for his age and personality.

Dr. Williams assessed that H.K. had a subarachnoid hemorrhage, characterizing it as a very common condition in children who have experienced a collision. Dr. Williams believed that the "masslike density" reflected in H.K's CT scan was consistent with H.K's reported collision and was likely a brain bruise or contusion.

Dr. Williams presented his findings to Dr. Hauptman, who, in turn, identified a list of "differential diagnoses"—potential diagnoses in decreasing order of probability based on a patient's history, clinical examination, and imaging findings. Dr. Hauptman concurred with Dr. Williams' determination that H.K. was most likely experiencing a subarachnoid hemorrhage. Dr. Hauptman determined that the next most likely diagnosis was a bleeding tumor, followed in likelihood by two different types of vascular malformation, followed, in turn, by the most remote possibility, a brain aneurysm.[4] A brain aneurysm was the least likely possible diagnosis, according to Dr. Hauptman, because such a condition is very rare in toddlers, is not typically located on the surface of the brain, and, when occurring

---

[4] Another witness testified that an aneurysm is an enlargement of an artery caused by the weakening of the arterial wall. Except for the brain aneurysm differential diagnosis, all of the other diagnoses would not require immediate surgical intervention.

4

in toddlers, typically involves symptoms of sickness and neurological compromise, which H.K. did not present with at the time.[5]

Thereafter, Dr. Williams, in consultation with his supervisor, Dr. Hauptman, concluded that H.K's condition was stable and that it was appropriate to admit H.K. to the neurosurgery floor for observation.

Dr. Hauptman also decided that an MRI and a magnetic resonance angiogram (MRA) should be ordered within a day of H.K.'s hospital admission to assist in ruling out the less likely differential diagnoses. Due to H.K.'s age, the duration of the imaging procedures, and the need for the child to remain still while the imaging was occurring, H.K. would likely need to be both sedated and intubated during that time.[6] Raymond Meyer, M.D., another neurosurgery resident, checked the availability of the hospital's magnetic resonance (MR) machines and the on-call anesthesiologists and determined that

> [t]here was a few problems. There were already ongoing MR studies that had a -- you know, that had already been started and others that had been scheduled. And then anesthesia availability was limited. And for general anesthesia, other than an emergency situations, patients have to be NPO, which is -- means nothing by

---

[5] Dr. Williams, recalling H.K.'s case at the resulting trial, testified that "it's a case I would remember even if we weren't here today. It was a surprise. And then also, the pathology was just something I had never seen or heard of before in an adult or a child, but especially in a child." Raymond Meyer, M.D., another neurosurgery resident at that time, recalled H.K.'s case and testified that H.K. "had a very unusual and dramatic presentation that I've only seen once."

[6] According to Dr. Williams,
when you have a two-year-old who needs an MRI and MRA, you know they're going to have to sit still in a scanner for like 45 minutes, and MRIs -- yeah. I mean, just getting him to sit still, a lot of adults have trouble actually staying still in the MRI that long, and they get claustrophobic. But with a child, if you need them to be perfectly still for that long, you have to sedate them heavily. And if you're going to sedate them heavily for that long in an enclosed environment, you usually have to intubate them. And so you have to coordinate getting this type of imaging with the anesthesia team because you know you're going to have to intubate and sedate them.

5

mouth, food or drink, for three, six, or eight hours, depending on what they eat or drink. And when [H.K.] had last eaten or drank, it was going to put us into a time period where the only anesthesia people available were going to be the emergency overnight team that was supposed to be called in for emergent cases in the operating room and only that.

Based on H.K.'s presentation, Dr. Hauptman did not believe that H.K.'s condition was severe enough to warrant either rescheduling previously scheduled MRIs for other patients or requesting that the after-hours on-call anesthesiologists be summoned to the hospital.[7] The MR procedures were therefore scheduled for the afternoon of the following day, April 18. Given that H.K. had been placed on a precautionary food and liquid intake restriction while in the emergency department, Dr. Hauptman decided to allow H.K. to eat that night, reasoning that H.K. was neurologically normal and hungry and that eating would not interfere with his scheduled imaging studies the following day.

Meanwhile, Dr. Hauptman ordered another CT scan without contrast of H.K.'s head. The resulting study reflected no significant change in the bleeding previously observed in H.K.'s skull.

During the night, the nursing staff observed that H.K. was quite active and they reported having difficulty keeping him calm or in bed.

The next morning, on April 18, Dr. Meyer arrived to examine H.K. and observed that he was sleeping, had just been awake, and was doing well. Later that morning, while the nursing staff drew H.K.'s blood for laboratory testing, H.K.

---

[7] Dr. Hauptman explained that he did not insist on immediately obtaining MR studies with anesthesia for H.K. because "I didn't think it was indicated at the time. The low likelihood of an aneurysm under this scenario would have not -- it just wouldn't have been the right thing to do. It wouldn't have been right to push a very, very specific study under less than ideal circumstances, to look for the one thing that was the least likely thing."

was "screaming for a long time and was quite worked up" but then went back to sleep. Thereafter, Kate tried to rouse H.K. so that he could eat but found that he was less responsive and difficult to awaken. Kate alerted the nursing staff, who observed that his vital signs showed hypertension and bradycardia. A code blue was activated.[8]

Dr. Hauptman, among several other physicians, arrived shortly thereafter and he ordered an emergency CT angiogram of H.K.'s blood vessels and vascular structures in his head. The resulting imaging study reflected a lesion, most likely representing a ruptured aneurysm. Dr. Hauptman recommended immediate surgical intervention. After obtaining the Kims' consent for surgery, H.K. was promptly brought to an operating room for emergency surgery.

The resulting surgery revealed a rupture of a middle cerebral artery aneurysm on the left side of H.K.'s brain. As part of the surgery, the surgeons removed a portion of H.K.'s skull bone to relieve intracranial pressure and to access his brain, and the surgeons clipped and removed the arterial aneurysm. Hospital staff collected swabs from the skull bone fragment—as part of a routine procedure to test for contamination—before it was frozen in anticipation for its later reimplantation after H.K. had recovered.

---

[8] Code blue is a hospital code for a medical emergency that requires resuscitation or immediate medical attention. Dr. Hauptman testified that he was finishing a surgery when
> I heard and overhead [sic] [a] page for what we call rapid response, which I think
> you guys have heard that term before here. That's when the child is ill and
> people come help. And the rapid response was on our unit, on our neuroscience
> unit. And I'm the attending on call, and so I immediately left the operating room
> and literally ran up to the -- to the rapid response.

H.K. was returned to the intensive care unit, where he remained in critical condition for a time. He later recovered sufficiently to be placed in inpatient rehabilitation.

During H.K.'s recovery period, on April 25, the hospital's microbiology lab notified H.K.'s clinical team of a positive test result from a swab that had been collected from H.K.'s skull bone fragment. The culture test was positive for fungal spores but did not identify the type of fungus. Two days later, more precise testing reflected that the fungus was *Aspergillus* but did not identify its species.[9] Five days later, now in early May, further testing identified the species of *Aspergillus*.

Over the next two weeks, an infection prevention team at the hospital conducted an investigation into the origin of the positive test result, which included investigating and interviewing those in the microbiology lab and those involved in H.K.'s surgery to determine when and where the contamination might have occurred. Around this time, the hospital's risk management team learned about the positive fungal test and began coordinating among the hospital's staff. The infection prevention team ultimately concluded that the most likely source of the fungal contamination was due to airborne exposure while H.K. was in the operating room.

On May 16, a representative from the hospital spoke with the Kims and notified them that a fungal test of H.K.'s skull bone fragment was positive for

---

[9] At the trial in this matter, a witness testified that *Aspergillus* is "a fungus. It is in our environment. It is a mold." Another witness testified that "*Aspergillus* is ubiquitous in the environment. We're all inhaling it every day when we walk around outside and maybe even in our houses."

*Aspergillus*, that the contamination had likely occurred during H.K.'s emergency surgery, and that H.K. had likely been exposed to *Aspergillus* during his surgery.

Thereafter, H.K.'s treating providers obtained his parent's consent for him to undergo diagnostic screening for a potential *Aspergillus* infection, which included MRI, central spinal fluid culture, blood tests, and a one-month regimen of prophylactic anti-fungal medication. It is undisputed that, despite his likely exposure to *Aspergillus*, H.K. did not become infected with the fungus.

The hospital determined that it could not re-implant the removed fragment of H.K.'s skull due to the fungal contamination. The hospital therefore discarded that portion of his skull. A prosthetic plastic flap was later implanted in its place.

H.K. was eventually discharged home in June. He has since developed significant neurological deficits.

In 2021, the Kims filed a complaint in King County Superior Court against the hospital alleging numerous claims against the hospital. As pertinent here, the Kims alleged that the hospital had failed to take reasonably prudent measures to prevent *Aspergillus* from infecting H.K., failed to maintain the hospital in a reasonably safe manner so as to eliminate the risk of *Aspergillus* infection, failed to obtain the Kims' informed consent when the hospital did not inform them of H.K.'s *Aspergillus* exposure and his skull bone's *Aspergillus* contamination, and violated the CPA by allegedly deceiving the public by marketing itself as a safe place to obtain medical treatment, which caused the Kims to experience a property injury.

The Kims later filed a second amended complaint alleging, as pertinent here, that the University of Washington was vicariously liable for medical negligence by, as applicable on appeal, Dr. Williams and Dr. Hauptman, for the treatment that they provided to H.K. on April 17, 2019.

Several months thereafter, the hospital filed a motion requesting summary judgment dismissal of the Kims' CPA claim. Following argument, the trial court granted the hospital's motion.

On August 15, the hospital filed a motion admitting to contaminating H.K.'s skull bone fragment with *Aspergillus*, admitting to exposing H.K. to *Aspergillus*, and requesting that the court accept its admissions. The court granted the hospital's motion.

In early November, a seven-week trial commenced. For the next month, the Kims presented their case in chief, calling to testify themselves, numerous medical experts, treating physicians and nurses, and hospital administrative staff and offering for admission numerous exhibits. In early December, the Kims rested their case in chief.

Thereafter, the hospital moved for judgment as a matter of law, as pertinent here, on the Kims' informed consent claims. The court granted the hospital's motion.

The University's and the hospital's cases in chief followed, in which they called to testify several of H.K.'s treating providers as well as several medical experts. Nearly two weeks later, the defendants rested their cases.

Thereafter, in a colloquy with the trial court, the Kims objected to the court's proposed issuance of four jury instructions, three of which supplemented the general standard of care instruction and one of which supplemented the general proximate cause instruction. The court overruled the Kims' objections and, thereafter, issued its instructions to the jury. After closing argument, the jury was excused for its deliberations.

Nearly one week later, the jury returned a verdict answering "yes" to the question of whether the hospital's "negligence proximately cause[d] injury or damages to plaintiffs as a result of the aspergillus contamination of [H.K.]'s bone flap and for [H.K.]'s exposure to aspergillus."[10] The jury awarded the Kims' an amount of damages totaling $750,000, awarding them each a sum of $250,000.

The jury also returned a verdict answering "no" to the question of whether the University was "negligent because one or more of the pediatric neurosurgeons or pediatric radiologists who treated [H.K.] on April 17, 2019 breached the standard of care."[11]

The trial court later entered judgment on the jury's verdict. The Kims, in response, filed a motion for a new trial, arguing that the four challenged jury instructions unduly emphasized the University's case. In a 10-page order, the trial court denied their motion.

---

[10] The jury verdict form reflected the hospital's admission of liability with regard to *Aspergillus* contamination and exposure, with a "yes" indicated in response to the question of whether "Seattle Children's Hospital [was] negligent for the aspergillus contamination of [H.K.]'s bone flap and for [H.K.]'s exposure to aspergillus."

[11] The jury, following the verdict form instructions, did not answer the subsequent question of whether, if it found that the University was negligent, that such negligence was a proximate cause of H.K.'s injury.

The Kims now appeal.

II

The Kims assert that the trial court erred in granting Seattle Children's Hospital's motion for summary judgment on their CPA claim and in granting the hospital's motion for judgment as a matter of law on their informed consent claim. As to each assertion of error, we disagree.

A

The Kims first contend that the trial court erred in granting the hospital's motion for summary judgment on their CPA claim. We conclude to the contrary.

1

It is a familiar standard that

> [s]ummary judgment is proper only when pleadings, depositions, admissions, and affidavits show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. On review, we engage in the same inquiry as the trial court. We consider facts in the light most favorable to the nonmoving party. Review is de novo. CR 56(c); Fidelity Mortgage Corp. v. Seattle Times Co., 131 Wn. App. 462, 467, 128 P.3d 621 (2005).

Stephens v. Omni Ins. Co., 138 Wn. App. 151, 166, 159 P.3d 10 (2007), aff'd sub nom. Panag v. Farmers Ins. Co. of Wash., 166 Wn.2d 27, 204 P.3d 885 (2009).

Our Supreme Court has described the applicable CPA standard as follows:

> RCW 19.86.090 allows anyone who has been "injured in his or her business or property by a violation" of the CPA to bring a civil action in which she may recover actual damages, trial costs, and attorney fees. . . . To state a prima facie claim under the CPA, a plaintiff must "establish five distinct elements: (1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3)

public interest impact; (4) injury to plaintiff in his or her business or property; (5) causation." Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d 778, 780, 719 P.2d 531 (1986).

Ambach v. French, 167 Wn.2d 167, 171, 216 P.3d 405 (2009); see also Young v. Toyota Motor Sales, U.S.A., 196 Wn.2d 310, 316, 472 P.3d 990 (2020). Failure to satisfy even one of the foregoing elements is fatal to a CPA claim. Hangman Ridge, 105 Wn.2d at 793.

The fourth element—"injury to plaintiff in his or her business or property"— is at issue herein. Our Supreme Court has instructed that "[t]he legislature's use of the phrase 'business or property' in the CPA is restrictive of other categories of injury and is 'used in the ordinary sense [to] denote[ ] a commercial venture or enterprise.'" Ambach, 167 Wn.2d at 172 (second and third alterations in original) (quoting Stevens v. Hyde Athletic Indus., Inc., 54 Wn. App. 366, 370, 773 P.2d 871 (1989)). The court further instructed that "[p]ersonal injury damages . . . 'are not compensable [damages] under the CPA' and do not constitute injury to business or property." Ambach, 167 Wn.2d at 173 (second alteration in original) (quoting Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp., 122 Wn.2d 299, 317-18, 858 P.2d 1054 (1993); citing Hiner v. Bridgestone/ Firestone, Inc., 91 Wn. App. 722, 730, 959 P.2d 1158 (1998), rev'd on other grounds, 138 Wn.2d 248, 263-64, 978 P.2d 505 (1999)); Stevens, 54 Wn. App. at 369-70. Notably, according to the court, property under the CPA, "does not include rights to one's person or body." Ambach, 167 Wn.2d at 172 (citing BLACK'S LAW DICTIONARY 226 (9th ed. 2009)).[12]

---

[12] Other examples of damages that are not injuries to property or business recoverable under the CPA include pain and suffering, medical expenses, lost wages, and lost earning

2

Here, in moving for summary judgment on the CPA claim, the hospital argued that the Kims did not establish that the hospital's conduct regarding H.K.'s skull bone fragment constituted property damage under that act. The Kims, for their part, responded that "the disposal of H.K.'s skull flap, temporary deprivation of medical test results, and/or the on-going deprivation of promised investigation results regarding the contamination of H.K.'s skull flap constitute[d] injury to property." The court granted the hospital's motion and dismissed the CPA claim, concluding that the Kims' alleged damages "are not property damages cognizable under that statute." The Kims do not establish that the trial court erred by so ruling.

i

The Kims first assert that the trial court erred by rejecting their argument that, when the hospital disposed of H.K.'s skull fragment after it was contaminated with *Aspergillus*, such disposal constituted property damage under the CPA. The hospital responds that such conduct does not constitute property damage under the act. The hospital has the better argument.

As set forth above, our Supreme Court has instructed that "property" under the CPA "does not include rights to one's person or body." Ambach, 167 Wn.2d at 172 (citing BLACK'S, supra, at 226). The Kims, for their part, do not present cogent argument or authority in support of the proposition that, despite

---

capacity. Ambach, 167 Wn.2d at 173 (citing Fisons, 122 Wn.2d at 317-18; Hiner, 91 Wn. App. at 730; Stevens, 54 Wn. App. at 369-70).

the foregoing, H.K.'s skull bone fragment constituted property for the purpose of the CPA.

The Kims next rely on RCW 68.50.160, a statutory provision codified in Title 68 RCW, Cemeteries, Morgues, and Human Remains.  However, they do not present any argument or analysis in support of how this statutory provision is material to their assertion on appeal.  The Kims also assert that a portion of a person's body that has been removed for the purpose of a medical procedure becomes one's property, rather than remaining a body part.  However, they present no analysis or decisional or statutory authority in support of this contention.  We do not consider assertions on appeal inadequately supported by argument or authority.  RAP 10.3(a)(6).

Thus, the hospital's position prevails.

ii

The Kims next assert that, when the hospital allegedly failed to disclose to them information regarding both the presence of *Aspergillus* in the hospital and the possibility of H.K.'s *Aspergillus* exposure and the contamination of his skull bone fragment, the withholding of this information constituted a property injury under the CPA.  This is so, the Kims contend, because they had a right to make an informed decision about H.K.'s treatment and they had a right to the results of the hospital's facility-wide *Aspergillus* investigation, the deprivation of which constituted property injuries.

The hospital responds that the Kims did not cite to decisional or statutory authority establishing that deprivation of access to such information constitutes a

15

property injury within the ambit of the CPA. The hospital is correct. We do not consider claims unsupported by authority. RAP 10.3(a)(6).

The Kims nevertheless rely on our decision in Handlin v. On-Site Manager Inc., 187 Wn. App. 841, 351 P.3d 226 (2015), to support their position. However, our decision therein regarded a consumer's property right under the Fair Credit Reporting Act, chapter 19.184 RCW, to a consumer reporting agency's assembled information regarding the consumer's creditworthiness. Handlin, 187 Wn. App. at 850. The Kims do not provide persuasive analysis or authority in support of the notion that our analysis in Handlin—or the underlying statutory authority discussed therein—is applicable to the matter before us. Accordingly, we do not consider this claim. RAP 10.3(a)(6).

The Kims also rely on Keogan v. Holy Family Hospital for the proposition that a physician has a duty to disclose certain information to a patient "'whenever the doctor becomes aware of an abnormality which may indicate risk or danger'" and that an injury arising from the breach of that duty constitutes a property injury under the CPA. 95 Wn.2d 306, 314, 622 P.2d 1246 (1980) (quoting Gates v. Jensen, 92 Wn.2d 246, 251, 595 P.2d 919 (1979)).

However, our Supreme Court's decision therein did not regard the CPA or an injury to property but, rather, regarded an informed consent claim. Keogan, 95 Wn.2d at 313-14. In addition, the Kims do not provide argument or analysis in support of the proposition that damages arising from a breach of a duty to provide informed consent constitutes a property injury under the CPA. Furthermore, even if the Kims had made such a showing, our Supreme Court

16

has stated that "the lead opinion in Keogan has limited precedential value because the five justices who concurred and dissented outnumbered those who signed the lead opinion." Anaya Gomez v. Sauerwein, 180 Wn.2d 610, 626, 331 P.3d 19 (2014). Given all of this, the Kims' reliance on Keogan is unavailing.

The Kims next rely on RCW 70.02.005 and RCW 70.03.020 and assert that these provisions support the contention that they have a property right to medical information cognizable under the CPA.

RCW 70.02.005 is located in chapter 70.02 RCW, "Medical Records–Healthcare," and reads, in pertinent part, as follows: "**Findings.** The legislature finds that . . . (2) Patients need access to their own health care information as a matter of fairness to enable them to make informed decisions about their health care and correct inaccurate or incomplete information about themselves."

RCW 70.03.020, for its part, is located in chapter 70.03 RCW, "Medical Records—Providing Information to Patients," and reads, in pertinent part, as follows:

> If a health care provider is acting in good faith, within the provider's scope of practice, education, training, and experience, including specialty areas of practice and board certification, and within the accepted standard of care, a health care entity may not:
>    (a) Limit the health care provider's provision of:
>    (i) Medically accurate and comprehensive information and counseling to a patient regarding the patient's health status including, but not limited to, diagnosis, prognosis, recommended treatment, treatment alternatives, and any potential risks to the patient's health or life.

RCW 70.03.020(1).

These provisions do not expressly mention the CPA nor that medical records or health care information constitute property or that the deprivation of either constitutes property damage under that act. Furthermore, the Kims do not provide statutory analysis or decisional authority in support of such propositions. Therefore, the Kims' reliance on these statutory provisions also does not establish an entitlement to appellate relief.

iii

Lastly, the Kims assert that, when they incurred eight miles of travel expenses for driving from their pediatrician's office to Seattle Children's Hospital on the day in question, their travel expenses constituted property damage under the CPA. The hospital responds that the Kims did not prove that such costs constituted property damages. The hospital's position prevails.

"'A claimant has the burden of proof on the amount of damages and must come forward with sufficient evidence to support a damages award.'" Univ. of Wash. v. Gov't Emps. Ins. Co., 200 Wn. App. 455, 480, 404 P.3d 559 (2017) (quoting Mut. of Enumclaw Ins. Co. v. Gregg Roofing, Inc., 178 Wn. App. 702, 715-16, 315 P.3d 1143 (2013)).

Here, in support of experiencing property damage pursuant to the CPA, Kate signed a declaration stating that, had she learned before driving to Seattle Children's Hospital on the day in question that the hospital had issues with *Aspergillus*, she would not have driven there:

> If I knew then what I know now about Seattle Children's Hospital's long-term problem with Aspergillus, I wouldn't have taken my son there. Specifically, if they had made known that there were patient

18

safety threats from Aspergillus mold exposure, which were never shared with the public before my son's admission, we would not have him stay there. We chose Seattle Children's Hospital over other choices based on its reputation.

Kate's declaration does not adequately establish damages for the purpose of the Kims' CPA claim against the hospital. Although the foregoing declaration stated that Kate had incurred a cost in driving to Seattle Children's Hospital that she would have not otherwise incurred, the Kims do not present evidence to support that such a cost constituted a damage to them. Indeed, the Kims do not present specific evidence in support of what they would have done instead of driving to the hospital in question. The Kims do not establish that, for example, they would have otherwise driven home with H.K., that such a drive would have cost them less than driving to the hospital in question, and that, therefore, they spent a sum of money that they otherwise would not have done so. Nor, for that matter, do the Kims establish they would have driven H.K. to a different children's hospital—or any other hospital—that would have resulted in them incurring a greater cost in traveling to the other specified location. Given such an absence of proof, although it is undisputed that the Kims incurred a cost, the Kims have not established that such a cost constituted an injury in fact arising from their decision to drive to the hospital in question.

Thus, the trial court did not err in concluding that the Kims did not establish a cognizable property injury under the CPA arising from the hospital's conduct herein. Accordingly, the trial court did not err by granting the hospital's motion for summary judgment on the Kims' CPA claim against the hospital.

19

B

The Kims next assert that the trial court erred by granting Seattle Children's Hospital's motion for judgment as a matter of law on their informed consent claim against the hospital. We disagree.

1

We review a trial court's CR 50(a) determination de novo. Weber Constr., Inc. v. Spokane County, 124 Wn. App. 29, 33, 98 P.3d 60 (2004) (citing Hill v. BCTI Income Fund-I, 144 Wn.2d 172, 187-88, 23 P.3d 440 (2001)).

CR 50(a) states, in pertinent part:

(1) Nature and Effect of Motion. If, during a trial by jury, a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find or have found for that party with respect to that issue, the court may grant a motion for judgment as a matter of law against the party on any claim, counterclaim, cross claim, or third party claim that cannot under the controlling law be maintained without a favorable finding on that issue.

Therefore, a CR 50(a) motion should be granted if a plaintiff fails to produce substantial evidence to sustain a verdict in the plaintiff's favor. Lodis v. Corbis Holdings, Inc., 192 Wn. App. 30, 62, 366 P.3d 1246 (2015); Bishop of Victoria Corp. Sole v. Corporate Business Park, LLC, 138 Wn. App. 443, 453, 158 P.3d 1183 (2007).[13]

The statutory informed consent provision at issue provides as follows:

---

[13] "Substantial evidence" is evidence sufficient to persuade a fair-minded, rational person of the truth of a declared premise. Alejandre v. Bull, 159 Wn.2d 674, 681, 153 P.3d 864 (2007); Corey v. Pierce County, 154 Wn. App. 752, 761, 225 P.3d 367 (2010). It is prejudicial error to submit an issue to the jury when there is no substantial evidence concerning it. Columbia Park Golf Course, Inc. v. City of Kennewick, 160 Wn. App. 66, 90, 248 P.3d 1067 (2011).

**Failure to secure informed consent—Necessary elements of proof—Emergency situations.** (1) The following shall be necessary elements of proof that injury resulted from health care in a civil negligence case or arbitration involving the issue of the alleged breach of the duty to secure an informed consent by a patient or his or her representatives against a health care provider:

      (a) That the health care provider failed to inform the patient of a *material fact or facts relating to the treatment;*

      (b) That the patient consented to the treatment without being aware of or fully informed of such material fact or facts;

      (c) That a reasonably prudent patient under similar circumstances would not have consented to the treatment if informed of such material fact or facts;

      (d) That the treatment in question *proximately caused injury* to the patient.

      (2) Under the provisions of this section *a fact is defined as or considered to be a material fact*, if a reasonably prudent person in the position of the patient or his or her representative would attach significance to it [in] deciding whether or not to submit to *the proposed treatment.*

      (3) Material facts under the provisions of this section which must be established by expert testimony shall be either:

      (a) The nature and character of the *treatment proposed and administered*;

      (b) The anticipated results of the *treatment proposed and administered*;

      (c) The recognized possible *alternative forms of treatment*; or

      (d) The recognized serious possible risks, complications, and anticipated benefits involved in the treatment administered and in the recognized possible alternative forms of treatment, *including nontreatment.*

RCW 7.70.050 (emphasis added).

Although the statutory provision does not define "treatment," the statutory text references "treatment" in the context of "proposed treatment," "administered treatment," "alternative forms of treatment," or "nontreatment," which together suggests that the statutory provision is limited to situations in which treatment of a patient is offered or considered by healthcare personnel. RCW 7.70.050. This is consistent with our Supreme Court's discussion that the foregoing provision

21

"clearly uses the word 'treatment,' demonstrating the intent to limit informed consent claims *to treatment situations.*" Anaya Gomez, 180 Wn.2d at 617 (emphasis added).[14]

2

Here, it is undisputed that, on April 25, the hospital learned that certain swab samples that were collected from H.K.'s skull fragment during his earlier emergency surgery and then cultured in a laboratory had tested positive for fungal contamination. It is also undisputed that April 25 was the earliest potential day on which the hospital could have informed the Kims that H.K. might have been exposed to an infective fugus. It is further undisputed that on May 16, hospital staff informed the Kims that, after their investigation, they had concluded that H.K. had been exposed to a specific type of *Aspergillus* during his emergency surgery. It is also undisputed that, between April 25 and May 15, the hospital had not proposed, administered, or considered any alternatives to treatment for H.K.—or decided not to pursue treatment—in light of what was later determined to be an *Aspergillus* exposure.

The parties further do not dispute that, immediately after informing the Kims of H.K.'s *Aspergillus* exposure, hospital staff proposed a course of treatment to the Kims for H.K. in the form of anti-fungal medication and diagnostic testing. It is also undisputed that the hospital obtained the Kims'

---

[14] Moreover, "informed consent is available only when there is something to inform the patient about." Anaya Gomez, 180 Wn.2d at 626-27 (citing Backlund v. Univ. of Wash., 137 Wn.2d 651, 975 P.2d 950 (1999); Keogan, 95 Wn.2d 306). Indeed, our Supreme Court instructed, "[g]iven the vast number of false positive test results that occur in Washington on a daily basis, imposing a duty on health care providers to inform every patient about every test result would be unduly burdensome, pointless, and unwise." Anaya Gomez, 180 Wn.2d at 627.

informed consent to that treatment and that the hospital provided such treatment to H.K.  It is further undisputed that, despite his exposure to *Aspergillus*, H.K. did not become infected by *Aspergillus* during the time in question nor did he experience side effects from the antifungal medication.

Given all of this, the Kims do not establish that, during the time in question, the hospital proposed or administered treatment to H.K. for an *Aspergillus* exposure for which they did not provide informed consent.  Indeed, the record does not reflect that, from April 25 to prior to May 16, the hospital proposed, administered, or considered any alternatives to treatment—or decided not to pursue treatment—in light of H.K.'s *Aspergillus* exposure.  Rather, the record reflects that, during that time, the hospital was investigating to determine the type of fungus present, the time at which the swabs had become contaminated with the fungus in question, and the potential for H.K. to have been exposed to that fungus during the surgery in question.

Furthermore, the record reflects that, on May 16, the hospital obtained informed consent from the Kims with regard to treating H.K. for an *Aspergillus* exposure.  Indeed, on that day, hospital staff provided to the Kims a proposed course of treatment for H.K. in response to his *Aspergillus* exposure, obtained the Kims' informed consent to proceed with such treatment, and administered that treatment to H.K.  Therefore, the record does not reflect that the hospital failed to obtain the Kims' informed consent prior to providing treatment to H.K. for

23

*Aspergillus* exposure. Thus, the Kims do not establish that the hospital's conduct constituted a violation of the informed consent statute.[15]

The Kims next contend that the hospital's knowledge of a possibility that H.K. had been exposed to an infective—but as yet unidentified—fungus constituted a material fact under the informed consent statute and that the hospital's alleged delay in not informing the Kims until it had completed its investigation constituted treatment under that act. This argument does not bear out.

As set forth above, a material fact for the purpose of obtaining—or providing—informed consent is one that "a reasonably prudent person in the position of the patient or his or her representative would attach significance to it [in] deciding whether or not to submit to *the proposed treatment*." RCW 7.70.050(2) (emphasis added). Thus, the existence of proposed treatment is a predicate to establishing a material fact pursuant to the informed consent statute.

As previously discussed, the record does not establish that the hospital proposed any treatment for H.K. between April 25 and May 15 with regard to what was later determined during that time to be an exposure of H.K. to *Aspergillus*.[16] Therefore, the Kims have not established that the hospital's

---

[15] The Kims assert that certain expert witness testimony supports that the hospital violated the informed consent statute. This is so, according to the Kims, because an expert witness testified that, once the hospital learned of the possibility that H.K. had been exposed to *Aspergillus* on April 25, the hospital should have informed the Kims of that information on that day. However, this testimony does not establish that such information was related to "treatment" under the informed consent statute or establish that, between April 25 and prior to May 16, the hospital proposed treatment, administered treatment, considered treatment alternatives, or decided not to treat H.K. for his *Aspergillus* exposure. Accordingly, it did not suffice to overcome the hospital's request for relief.

[16] The Kims also rely on Flyte v. Summit View Clinic, 183 Wn. App. 559, 572-80, 333 P.3d 566 (2014), to support their proposed interpretation of the informed consent statute.

knowledge of a possibility that H.K. had been exposed to a fungus constituted a material fact under the statute in question. Hence, the hospital is correct with regard to the absence of a material fact for the purpose of the informed consent statute with regard to H.K. and his exposure to *Aspergillus* during the time in question.

Thus, the hospital properly argued that there was no legally sufficient evidentiary basis for a reasonable jury to find in the Kims' favor on their informed consent claim against the hospital. Accordingly, the trial court did not err by granting the hospital's motion for judgment as a matter of law on the Kims' informed consent claim.[17]

III

The Kims next assert that the trial court erred by issuing certain instructions to the jury that, according to the Kims, overemphasized the University's theory of the case and, therefore, deprived them of their right to a fair trial. For its part, the University responds that the challenged instructions were

---

However, their reliance is unavailing. In Flyte, Division Two of this court identified that the hospital staff therein had not provided certain medical information to a patient in the course of treating that patient and, the court concluded, such information would be significant to a patient's decision as to "whether to submit to the *proposed course of treatment*, specifically, to wait for further developments and go to the emergency room if the symptoms worsened." Flyte, 183 Wn. App. at 578 (emphasis added). Because the record herein does not establish that the hospital had proposed any fungal or *Aspergillus* treatment for H.K. during the period from April 25 until May 16, Flyte is at variance with our analysis.

[17] The trial court also granted the hospital's motion on the basis that the Kims did not establish that the hospital's alleged failure to obtain informed consent injured them. We again note that it is undisputed that, despite the hospital's determination that H.K. had been exposed to *Aspergillus*, H.K. did not become infected by that fungus during the time in question nor did he experience side effects from the antifungal medication provided in the course of his treatment. Given our resolution of this matter, however, we need not consider this determination by the trial court.

appropriate and did not otherwise prejudice the Kims.  The University has the better argument.

A

Whether to give a proposed jury instruction is within a trial court's discretion.  We review the decision for an abuse of discretion.  Christensen v. Munsen, 123 Wn.2d 234, 248, 867 P.2d 626 (1994); Seattle W. Indus., Inc. v. David A. Mowat Co., 110 Wn.2d 1, 9, 750 P.2d 245 (1988); Thomas v. Wilfac, Inc., 65 Wn. App. 255, 264, 828 P.2d 597 (1992) (citing Petersen v. State, 100 Wn.2d 421, 440, 671 P.2d 230 (1983)).

The propriety of a jury instruction is governed by the facts of the particular case.  Housel v. James, 141 Wn. App. 748, 759, 172 P.3d 712 (2007).  As a whole, jury instructions are generally sufficient if they are supported by the evidence, allow each party to argue its theory of the case, and properly inform the jury of the applicable law.  Housel, 141 Wn. App. at 758.

B

Here, in a colloquy regarding the instructions to be issued to the jury, the Kims objected to the issuance of four instructions.  The trial court overruled the Kims' objections.

The first challenged instruction was worded as follows:

> A physician is not liable for selecting one of two or more alternative diagnoses if, in arriving at the judgment to make the particular diagnosis, the health care provider exercised reasonable care and skill within the standard of care the health care provider was obliged to follow.

Jury Instruction 14. This followed the wording of Washington Pattern Jury

Instruction 105.08:

> A physician is not liable for selecting one of two or more alternative [courses of treatment] [diagnoses], if, in arriving at the judgment to [follow the particular course of treatment] [make the particular diagnosis], the physician exercised reasonable care and skill within the standard of care the physician was obliged to follow.

6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 105.08

(7th ed. 2019) (WPI).

The next challenged jury instruction was worded as follows: "A poor

medical result is not, by itself, evidence of negligence." Jury Instruction 15. The

wording of this instruction followed that of WPI 105.07: "A poor medical result is

not, by itself, evidence of negligence."

The next challenged jury instruction was worded as follows:

> The question of whether or not a physician exercised care and skill, as defined elsewhere in these instructions, is to be determined by reference to what was known in relation to the case at the time of the treatment or examination, and must be determined by reference to the pertinent facts then in existence of which he or she knew or in the exercise of reasonable prudence, should have known, and should not be determined in the light of any after-acquired knowledge.

Jury Instruction 16.[18]

---

[18] Jury instruction 11, which the Kims did not challenge, was worded as follows:
> A health care professional owes to the patient a duty to comply with the standard of care for one of the profession or class to which he or she belongs.
> A pediatric neurosurgeon has a duty to exercise the degree of skill, care, and learning expected of a reasonably prudent pediatric neurosurgeon acting in the same or similar circumstances at the time of the care or treatment in question.
> A pediatric radiologist has a duty to exercise the degree of skill, care, and learning expected of a reasonably prudent pediatric radiologist acting in the same or similar circumstances at the time of the care or treatment in question.
> Failure to exercise such skill, care, and learning constitutes a breach of the standard of care and is negligence.

The last challenged jury instruction was worded as follows:

> Medical testimony must establish the causal relationship between the plaintiff[s'] injury and the alleged negligence of a defendant. Such testimony must be in terms of "a reasonable degree of medical certainty" or "a reasonable degree of medical probability." Medical testimony that an incident "could" cause, "can" cause, "may" cause, or "might" cause such an injury is not sufficient because these terms indicate a possibility rather than a probability.

Jury Instruction 17.[19]

In assigning error to the foregoing instructions, the Kims do not contend that any of these instructions, taken individually, were unsupported by the evidence, prevented them from arguing their theory of the case, or did not properly inform the jury of the law to apply.[20] See Housel, 141 Wn. App. at 758. Given that, it is undisputed on appeal that these instructions, taken individually, were generally sufficient.

Nonetheless, the Kims assert that the foregoing instructions, when issued in combination with one another, overemphasized the University's theory of the case and unnecessarily emphasized the limits of the physicians' liability. Upon review, we conclude that the trial court did not err in instructing the jury.

---

Jury Instruction 11. The wording of this instruction followed that of WPI 105.02.

[19] This instruction was intended to supplement Instruction 13, a standard proximate cause instruction, which was worded as follows:
> A cause of an injury is a proximate cause if it is related to the injury in two ways: (1) the cause produced the injury in a direct sequence, and (2) the injury would not have happened in the absence of the cause.
> There may be more than one proximate cause of an injury.

Jury Instruction 13. The wording of this instruction followed that of WPI 15.01.01.

[20] In their reply brief, the Kims stated that the University
> spends a significant amount of its brief addressing arguments the Kims did not make, including why each individual challenged instruction was appropriate. The Kims assigned error to instructions 14-17 in the aggregate because they so repetitiously focused on defining the medical providers' duties in the negative, which unduly emphasized the [University's] version of the case.

Reply Br. of Appellants at 33.

C

Our analysis is guided by our recent decision in Beard v. Everett Clinic,

No. 85208-6-I, slip op. at 64-67 (Wash. Ct. App. Oct. 28, 2024), available at

https://www.courts.wa .gov/opinions/pdf/852086.pdf.  There, we stated as

follows:

> Beard contends that issuing both the no guarantee-poor result and exercise of judgment instructions together was unfair because it overemphasized the defense theory of the case and unnecessarily emphasized the limits of physician liability.  Beard argues that four standard of care instructions were given, two of which were neutral,[21] while the other two—no guarantee-poor result and exercise of judgment instructions—were slanted in Dr. Gala's favor. . . .
>
>          . . .
>          "Generally, the reviewing court considers an objection to the exclusion of a specific instruction by examining the instructions as a whole." Vasquez v. Markin, 46 Wn. App. 480, 490, 731 P.2d 510 (1986).  "When the instructions as a whole so repetitiously cover a point of law or the application of a rule as to grossly overweigh their total effect on one side and thereby generate an extreme emphasis in favor of one party to the explicit detriment of the other party, it is, we think, error." Samuelson v. Freeman, 75 Wn.2d 894, 897, 454 P.2d 406 (1969).
>          However, the standard of care instruction, no guarantee-poor result instruction, and exercise of judgment instruction are routinely given together in Washington courts.  The note on use to the WPI 105.08 states that when the exercise of judgment instruction is issued, "[t]he court should give WPI 105.07 (No Guarantee—Poor Result) . . . with this instruction." [WPI 105.08, at 625.]  In accordance with this recommendation, the issuance of these two instructions in tandem is routinely upheld on appeal. See Christensen[ v. Munsen], 123 Wn.2d [234, ]247-49[, 867 P.2d 626 (1994)]; Watson[ v. Hockett], 107 Wn.2d [158, ]161-170[, 727 P.2d 669 (1986)]; Miller[ v. Kennedy], 91 Wn.2d [155, ]159-61[, 588 P.2d 734 (1978)]; Vasquez, 46 Wn. App. at 487-89.
>          . . .

_____

[21] In Beard, we stated in a footnote that "[t]he two 'neutral' instructions were jury instruction 7 (which defined the standard of care and negligence in accordance with WPI 105.01) and jury instruction 6 (which set forth plaintiff's burden of proof in accordance with WPI 105.03)." No. 85208-6-I, slip op. at 64 n.24.

The no guarantee-poor result instruction and exercise of judgment instructions are supplemental to the general and specialist standard of care instructions. The guidance provided in both WPI 105.07 and WPI 105.08 clearly instruct courts that they "should give" or "use," "when appropriate," "this instruction to supplement either WPI 105.01 (Negligence—General Health Care Provider), or WPI 105.02 (Negligence—Health Care Provider—Specialist)."

Once again, <u>Watson</u> explains that

[t]he "no guarantee", "bad result" and "error in judgment" instructions discussed above, to use the phraseology of <u>Miller</u>, "supplement" the standard of care; *while they may clarify it, they do not change it.* Thus, these instructions can only be given in connection with a proper standard of care instruction.

107 Wn.2d at 166-67 (emphasis added);[22] <u>see</u> <u>also</u> <u>Christensen</u>, 123 Wn.2d at 248. These instructions are intended to remind the jury that "medicine is an inexact science." <u>Fergen[ v. Sestero]</u>, 182 Wn.2d [794,] 804[, 346 P.3d 708 (2015)] (citing <u>Watson</u>, 107 Wn.2d at 167).

. . .

It is plain that the legal principles contained in the two challenged instructions have repeatedly been deemed to be the proper subjects of jury instructions. Basing a challenge on the mere number of instructions given is a pointless approach. So long as the supplemental instructions were truly that, and were not repetitive, it matters little whether the legal principles were set forth in one, two, or three supplemental instructions.

We find Beard's reliance on the 1969 decision in <u>Samuelson</u> unavailing. In that case, the Supreme Court held that the trial court's issuance of six consecutive standard of care instructions constituted an "extreme case where they overlap and are repetitive to such a degree that a court of review must find them palpably unfair." <u>Samuelson</u>, 75 Wn.2d at 897.

The court then noted that "[t]his overweighing of the instructions is not likely to recur . . . because of the recent publication in this state of [the] Washington Pattern Jury Instructions . . . which set forth possible instructions concerning standards of medical practice and seem to do so with fairness and reasonable brevity." <u>Samuelson</u>, 75 Wn.2d at 897.

The <u>Samuelson</u> court's prediction has apparently borne out. Other than <u>Samuelson</u>, the sole case authority cited to us by Beard that ruled similarly to <u>Samuelson</u> is <u>Brown v. Dahl</u>, 41 Wn. App.

---

[22] We noted that, "[i]n <u>Watson</u>, the 'no guarantee' and 'bad result' principles were contained in separately issued instructions. Thus, three supplemental instructions were approved of, rather than the two at issue herein." <u>Beard</u>, No. 85208-6-I, slip op. at 66 n.26.

565, 579, 705 P.2d 781 (1985), a 39-year old decision in which the trial court issued five instructions on the standard of care that were "strikingly similar to those held to be unduly overemphasiz[ing] in <u>Samuelson</u>."

The absence of recent authority following <u>Samuelson</u>'s holding reinforces our belief that the trial court did not herein err by issuing these two challenged pattern instructions in accordance with the recommendation set forth in the note on use applicable to these very instructions.

The combination of the general standard of care instruction plus the two properly issued supplemental instructions did not constitute an overemphasis in the whole of the jury instructions.

<u>Beard</u>, No. 85208-6-I, slip op. at 64-67 (footnotes omitted).

D

The trial court concluded that the court's instructions were not unfairly slanted in favor of the defendants. As set forth below, the trial court did not err in so concluding.

With regard to jury instruction 14, on the exercise of judgment principle, and jury instruction 15, on the poor result principle, the Kims do not dispute that these instructions were intended to supplement the standard of care instruction issued as jury instruction 11, which followed the wording of WPI 105.02. The Kims also do not dispute the propriety of the wording of these instructions. And, as we stated in <u>Beard</u>, "[t]he combination of the general standard of care instruction plus the two properly issued supplemental instructions did not constitute an overemphasis in the whole of the jury instructions." <u>Beard</u>, No. 85208-6-I, slip op. at 67. Rather, the Kims challenge the foregoing instructions as overemphasizing the University's theory of the case.

The Kims' challenge to the exercise of judgment instruction and poor result instruction is, in effect, the same challenge as that which we considered

31

and rejected in Beard. Thus, the Kims' first assertion does not establish that those two supplemental instructions contributed to an overemphasis of the University's theory of the case.

With regard to jury instruction 16, on the after-acquired knowledge principle, the Kims do not dispute that jury instruction 16 was provided as a supplement to the general standard of care instruction identified as jury instruction 11, nor do they dispute that the wording of jury instruction 16 was proper. Given that, the sole remaining basis on which the Kims seek to challenge jury instruction 16 is that it was the third such supplemental standard of care instruction issued to the jury by the trial court and, therefore, overemphasized the University's theory of the case.

However, as we stated in Beard, "[b]asing a challenge on the mere number of instructions given is a pointless approach. So long as the supplemental instructions were truly that, and were not repetitive, it matters little whether the legal principles were set forth in one, two, or three supplemental instructions." No. 85208-6-I, slip op. at 66. Therefore, an assertion of error predicated on the trial court's issuance of yet another supplemental standard of care instruction, without more, does not generate an overemphasis of one party's theory of the case. Thus, the trial court did not abuse its discretion in issuing this instruction.

With regard to jury instruction 17, the Kims again do not dispute that the wording of jury instruction 17 was proper. The Kims also do not meaningfully dispute that jury instruction 17 was intended to be issued as a supplemental

causation instruction to jury instruction 13, which, in turn, followed the wording of WPI 15.01.01.[23] Rather, the Kims aver that jury instruction 17 also overemphasized the University's theory of the case.

The trial court did not abuse its discretion in issuing jury instruction 17. In light of the absence of a dispute that jury instruction 17's wording was proper and that the instruction was intended to supplement another instruction—in this instance, a general proximate cause instruction—the Kims do not establish that this instruction overemphasized the University's theory of the case. Indeed, it is of little import that jury instruction 17 constituted the fourth supplemental instruction on physician liability because, once again, "[b]asing a challenge on the mere number of instructions given is a pointless approach." Beard, No. 85208-6-I, slip op. at 66. Moreover, given that jury instruction 17 was the only supplemental instruction on causation, it cannot be said to have overemphasized the causation component of physician liability. Beard, No. 85208-6-I, slip op. at 66. Thus, the challenge to jury instruction 17 does not establish an entitlement to appellate relief.

Lastly, the Kims rely on Samuelson and Dahl to support their challenge to the trial court's issuance of the foregoing instructions. However, in Beard, we found such reliance on this decisional authority unavailing in light of both the

---

[23] The Kims assert that no explanation was given to the jury for how jury instruction 17 works with jury instruction 10, a burden of proof instruction, and jury instruction 13, the general proximate cause instruction. However, the Kims do not provide argument or analysis as to how such an alleged absence of explanation is material to their assignment of error predicated on the challenged instructions overemphasizing the University's case.

absence of recent authority following these decisions and the <u>Samuelson</u> court's

prediction that

> "[t]his overweighing of the instructions is not likely to recur . . .
> because of the recent publication in this state of [the] Washington
> Pattern Jury Instructions . . . which set forth possible instructions
> concerning standards of medical practice and seem to do so with
> fairness and reasonable brevity."

<u>Beard</u>, No. 85208-6-I, slip op. at 67 (quoting <u>Samuelson</u>, 75 Wn.2d at 897).

We see no reason to depart from our determination in <u>Beard</u> with regard

to the challenged instructions herein.  Given all of this, the trial court did not

abuse its discretion in issuing the foregoing instructions to the jury in this matter.

Accordingly, the trial court did not err in entering judgment in this matter.

Affirmed.

_____ Dwyer, J.

WE CONCUR:

_____ _____
Bowman, J.                  Mann, J.